IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Cr. No. 20-1566 KWR |
| | ) | |
| vs. | ) | |
| | ) | |
| TIMOTHY CHISCHILLY and | ) | |
| STACEY YELLOWHORSE, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE TO STACEY YELLOWHORSE'S MOTION TO SUPPRESS STATEMENT TAKEN ON THE MORNING OF FEBRUARY 1, 2020

The United States responds to Defendant Stacey Yellowhorse's Motion to Suppress Statement Taken on the Morning of February 1, 2020. Doc. 77 ("Motion"). She argues that the statement should be suppressed on two grounds: (1) Yellowhorse made the statements without *Miranda* warnings while she was in custody; and/or (2) Yellowhorse's statement was involuntary. Motion at 2-10. Both arguments fail.

First, Yellowhorse was not in custody, so no *Miranda* warnings were needed. Yellowhorse gave these statements outside a home, uncuffed, in broad daylight, after the questioning FBI agent told her she was not under arrest. Those facts, and others explored below, establish that Yellowhorse was not in custody. Second, her statements were voluntary. Though complaining that her statements could not have been voluntary because she had just been assaulted and did not receive medical care until after the interview, the Motion ignores the fact that Yellowhorse explicitly rejected medical care during the interview several times. Indeed, the questioning agent asked Yellowhorse not once, but at least three times whether she wanted medical assistance, and, even though she told them she was fine, the agent still requested EMS for her. Now, however, she

insists that lack of medical care – which she did not want at the time -- makes her statements involuntary.   In short, there was no constitutional violation.  For those reasons, and others, the United States respectfully requests the Court deny the Motion.

## FACTUAL BACKGROUND[1]

This case arises from a murder where the defendants allegedly killed a woman, Jane Doe, by pinning her down with a hammer and nails, then bashing her head in with a sledgehammer. Doc. 3, at 4. In connection with an investigation into those allegations, on February 1, 2020, FBI special agent Dave Loos along with members of the Navajo Nation Police Department travelled to the home of Defendants Yellowhorse and Timothy Chischilly on information that the two were planning to leave the state.  See Ex 1 at 1.  Both were persons of interest in that ongoing homicide investigation.

Agent Loos and Officer Sloan with the Navajo police department arrived at the home around 8:30am.  Doc. 77-1 at 8.  The sun was out.  The home was in a rural area.  There were neighboring homes, but they were at a distance from each other.  As they arrived, Officer Sloan saw Yellowhorse walking toward his vehicle.  Id.  He told her to get on the ground, which she did. Id.  Officer Sloan then turned to Chischilly who he handcuffed and secured inside of his patrol vehicle.  Id.

As Officer Sloan arrested Chischilly, Yellowhorse stood up, approached Agent Loos, and began speaking to him immediately.  Ex. 1 at 1.  Yellowhorse was not handcuffed.  Id.  Because she started talking right away, Agent Loos did not have his audio recorder on for the beginning of her statement.  Id.

---

[1] The United States anticipates it could establish by a preponderance of the evidence the following at an evidentiary hearing.

Yellowhorse began by telling Agent Loos that Chischilly had beaten her up.  Id.  Agent Loos asked if she needed medical attention, which she declined.  Id.  At this point, Agent Loos was able to turn on his audio recorder.

Before asking her any questions about the offense, Agent Loos told Yellowhorse, "[y]ou're not under arrest right now."  Doc. 77-3 at 2.  She acknowledged that she understood.  Id.  Agent Loos proceeded to ask some questions about what she knew about a missing woman, Doe.  Id. at 2-3.  When Yellowhorse gave him information inconsistent with what Agent Loos already knew, he presented her with contrary information.  Though confronting her with conflicting facts, Agent Loos' tone was quiet and calm.  See Ex. 2 at 0:00 – 3:30.  The interview continued for just over an hour.  Agent Loos' tone remained low and conversational.  A criminal investigator with the Navajo police department – Custer[2] Bryant -- arrived partway through, Doc. 77-3, at 14, and his tone was also calm and conversational, e.g., Ex 2 at 9:25 – 11:56.

Yellowhorse explained during the interview that she did not know anything about what had happened to Doe.  E.g., Doc. 77-3 at 5 ("I don't know nothing.").  She told them that she had seen the missing woman before she disappeared but that they had dropped her off at a place called "Don Diego's."  Id. at 3.  Though she said she did not know anything, she also revealed several times that she might know more.  For example, in the middle of the interview she told both agents "I'll tell you the truth later."  Doc. 77-3 at 17; Ex 2 at 12:42-12:45; see also Doc. 77-3 ("Stacey Yellowhorse: Can you bring Timothy over here, and we'll tell you together, please? . . . [H]e'll tell you the truth, what happened.").  She also gave at least one conflicting, incriminating statement.  Specifically, she said "I had [Doe's] phone . . . [a]nd then, I got rid of it," but then

---

[2] The transcript misidentifies Custer as "Kaster."

quickly changed course to say "[Chischilly's] friend got rid of it." Doc. 77-3 at 7-8; Ex 2 at 4:39 – 4:57.

Towards the end of the interview, Yellowhorse asked Agent Loos to leave the recorder behind and "take a walk" with her. Doc. 77-3 at 53. Agent Loos agreed, and the two went for a walk hundreds of yards away from the home. She took him to a tree and told him to look around for a tooth that she had seen and thrown over here, which had scared her. Ex 1 at 5. She also pointed eastward and said "look out there, you can see [Doe's] spirit." Id. Yellowhorse then walked with Agent Loos to a spot further south along the road and, again, pointed eastward. Id. She told Agent Loos then that "there is a cult box out there where they sacrifice things." Id. at 5-6. They walked back to the home, where Yellowhorse was seen by EMS, and then arrested by Navajo police on alcohol-related charges. Id. at 6.

Though Agent Loos could smell alcohol coming from Yellowhorse's person during the interview, she was responsive to questions and she walked around with no issue. Indeed, as just recounted, they walked around together for hundreds of yards with no problem. Yellowhorse and the agents remained outside for the entirety of the interview. During the interview, Agent Loos asked if there were things that would make Yellowhorse more comfortable. For example, he asked her whether she wanted "to go get [her] coat" because it was cold. Doc. 77-3 at 6; Ex. 2 at 3:29-3:32. She declined. Id. Agent Loos offered her food – a granola bar. Doc. 77-3 at 9-10. She declined. Id. At another point, Yellowhorse voiced that she was cold and wanted to get into the sun, so they moved into the sun. Doc. 77-3 at 19-20; Ex 2 at 13:25 – 14:37. Agent Loos had his duty firearm on his person, but never unholstered it.

Yellowhorse also mentioned her injuries during the interview. E.g., Doc. 77-3 at 9. Agent Loos asked her several times whether she needed medical attention, but she declined:

4

> Stacey Yellowhorse: Now, look at my arms.  They're beat up more.
> Dave: Do you want an ambulance?  You want me to get you an ambulance here?
> Stacey Yellowhorse: I get one (indiscernible).
> Dave.  Okay.  All right.  I'm going to get you an ambulance.  Okay.  All right.
> Stacey Yellowhorse:  I'll be all right.

Doc. 77-3 at 9; Ex. 2 at 6:02 – 6:13.

> Stacey Yellowhorse:  My arm hurts so bad.
> Dave: Okay.  We're going to get you an ambulance, okay?
> Stacey Yellowhorse: No.
> Dave: You don't want an ambulance?  You don't want medical care?

Doc. 77-3 at 20; Ex 2 at 14:38 – 14:44; see also Doc. 77-3 at 33; 28:37 – 28:50 (asking again

whether Yellowhorse wants medical care to which Yellowhorse ignores).

When EMS did arrive, Agent Loos asked if he could have an additional minute to speak

with Yellowhorse.  She did not object:

> Unindentified Male: Hi.
> Unindentified Female: How are you doing?
> Unidentified Male: What's going on?
> Dave: Give us just one minute if you don't mind.
> Unidentified Female:  Yeah.
> Unindentified Male:  no problem.

Doc. 77-3 at 35; 32:39 – 32:47.  Agent Loos did note some cuts and bruises on Yellowhorse, but

no serious injuries.

## ARGUMENT

### I.        Yellowhorse was not in custody.

Yellowhorse argues her statements should be suppressed because Agent Loos did not give

her *Miranda* warnings prior to the interview.  Motion at 9-10.  For that *Miranda* requirement to

trigger, however, Yellowhorse needed to be "in custody," and she never was.  Specifically, her

freedom of movement during the interview – walking around, uncuffed, in broad daylight – shows

that she was never in custody.

It is well settled that "[a]n officer's obligation" such as Agent Loos's, "to administer *Miranda* warnings attaches . . . only where there has been such a restriction on a person's freedom as to render him 'in custody.'" Stansbury v. California, 511 U.S. 318, 322 (1994). Whether someone is in custody is a fact-intensive analysis and "a court must examine all of the circumstances surrounding the interrogation," but the "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. The inquiry is governed by "the objective circumstances of the interrogation," not on the "subjective views harbored" by the parties. Id.

At the outset, there was no "formal arrest" here. Agent Loos said to Yellowhorse, before he asked any questions about the offense, "[y]ou're not under arrest right now." Doc. 77-3 at 2; Ex 2 at 00:09 – 00:11. The circumstances also belie that her "freedom of movement" was restrained to a "degree associated with a formal arrest." She was not handcuffed. She was not confined to a space. The questioning occurred outside in broad daylight. Indeed, at two separate points during the interview, the agent and Yellowhorse went for a stroll together. Doc. 77-3 at 43, 55. On one of those occasions, Yellowhorse suggested the walk herself, to which the agent obliged. Doc. 77-3 at 55; Ex 2 at 46:05 -46:12.

Yellowhorse argues to the contrary, raising instances where the agents questioned Yellowhorse about what happened to the victim and to times where the agents said "come here" to Yellowhorse, Motion at 10 citing Doc. 77-3 at 18-19, but those brief exchanges do not transform this outdoor interview into a custodial interrogation where a reasonable person would not feel free to leave. Indeed, those exchanges' non-coercive nature is apparent from how they were delivered -- in a calm, quiet, respectful tone of voice. E.g., Ex. 2 at 12:10 – 13:29, see Doc. 77-3 at 18-19. Tone is essential to the analysis as it indicates objectively whether the interviewee would feel

compelled by a show of authority to remain.  Accordingly, a "calm and conversational" tone breaks

against a finding that Yellowhorse was in custody.  United States v. Jones, 523 F.3d 1235, 1242

(10th Cir. 2008) (concluding a defendant was not in custody in part because agent's "tone remained

calm and conversational" throughout "the interview"); see also United States v. Chee, 514 F.3d

1106, 1114 (10th Cir. 2008) ("[T]he tone remained calm and conversational throughout the

interrogation.").  Those conversational exchanges in a quiet tone do not render Yellowhorse in

custody.

The Tenth Circuit's non-exhaustive factors guiding the ultimate custodial inquiry also

counsel against a custody finding.  In determining whether someone is in custody, courts are to

weigh: (1) "the extent to which the suspect is made aware that he or she is free to refrain from

answering questions or to end the interview at will"; (2) "the nature of the questioning" where

"prolonged accusatory questioning is likely to create a coercive environment from which an

individual would not feel free to leave"; and (3) whether "police dominate the encounter," which

can include facts such as "separation of the suspect from family or colleagues; isolation in

nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an

officer; physical contact with the subject; and an officer's use of language or tone of voice in a

manner implying that compliance with the request might be compelled."  United States v. Jones,

523 F.3d at 1240.

The factors show Yellowhorse was not in custody.  To be sure, the first factor weighs

toward a custody conclusion, because the agents did not tell Yellowhorse she could end the

interview or stop answering questions at any time.  The other factors, however, weigh dispositively

against a custody finding.  The questioning was not "prolonged"; it was relatively short in fact –

just over an hour.  United States v. Lamy, 521 F.3d 1257, 1263 (10th Cir. 2008) (no custody finding

where "the interview lasted for about an hour."); United States v. Zar, 790 F.3d 1036, 1046-47 (10th Cir. 2015) (affirming district court's conclusion that a defendant was not in custody even with a three-hour interview).  The questions, moreover, were not accusatory.  Certainly, the agents said several times that they thought there were things Yellowhorse was not telling them, Doc. 77-3, at 2-3, but they never accused her of the murder they were investigating or of any crime.  Pointing out inconsistencies between an interviewee's statement with other facts known to investigators, as Agent Loos did during the interview, does not render the exchange accusatory.  United States v. Romero, 743 F. Supp. 2d 1281, 1334 (D.N.M. 2010) (concluding "no prolonged, accusatory questioning" even where an agent "presented" an "inconsistency" in the interviewee's statement with "other information [the agent] had collected").

The final factor – police domination – weighs considerably against a custody finding.  As mentioned above, the entire interview occurred outdoors, in a public area, where no firearms were displayed.  United States v. Guerrero-Hernandez, 95 F.3d 983, 986 (10th Cir. 1996) (concluding a defendant was not in custody where "INS agents approached [him] outdoors, in a public place, without displaying firearms"); United States v. Murillo-Gonzalez, 2021 WL 779781, at *8 (D.N.M. 2021) (no custody where "[t]he questioning occurred during daylight hours, on a public neighborhood road.").  Two law enforcement agents were present, but that routinely occurs in situation where courts have found no dominating police presence. E.g., Jones, 523 F.3d at 1242 (no dominating police presents where there were "multiple agents"); Lamy, 521 F.3d at 1263 (no "police dominated atmosphere" where "interview was conducted by two officers").  And, indeed, when Yellowhorse indicated she wanted to talk in just the presence of Agent Loos, they left the area of the second agent.  Doc. 77-3, at 43.  Other facts counsel against a police-dominated atmosphere finding, too.  As mentioned above, the agent's tone was quiet and respectful during

the interview.  While she was separated from a loved one Chischilly – her boyfriend – that was

because she told them he had just physically abused her.  These facts show that Yellowhorse was

not in custody.  Indeed, the facts diverge markedly from situations where the Tenth Circuit has

found someone "in custody."  See United States v. Revels, 510 F.3d 1269, 1275 (10th Cir. 2007)

(concluding a defendant was in custody where "seven police officers" woke up the defendant,

handcuffed her "face down on the floor," separated her from her family and children, and

interrogated her behind a closed door).

     In short, *Miranda* warnings were not needed for this statement, and the Court should not

suppress the statement on this ground.

     **II.      Yellowhorse's statements were voluntary.**

     Yellowhorse argues that her statements were involuntary because of her intoxication, her

injuries and distress, and because she was denied medical care.  Motion at 8.  The totality of the

circumstances, however, including her ability to walk around, converse responsively and

intelligently with officers, and her refusal of medical care show that Yellowhorse's statement was

voluntary.

> The determination of voluntariness is based on the totality of the circumstances.
> Relevant circumstances embrace both the characteristics of the accused and the
> details of the interrogation. Such factors include (1) the age, intelligence, and
> education of the defendant; (2) the length of detention; (3) the length and nature of
> the questioning; (4) whether the defendant was advised of his constitutional rights;
> and (5) whether the defendant was subject to physical punishment.

United States v. Lopez, 437 F.3d 1059, 1063–64 (10th Cir. 2006).  Those factors are relevant,

however, "only if th[e] court first concludes that the officers' conduct was coercive."  Id. at 1064.

Supreme Court caselaw echoes that requirement: to suppress a statement "coercive police activity"

must cause a "resulting confession by a defendant."  Colorado v. Connelly, 479 U.S. 157, 165

(1986) ("Absent police conduct causally related to the confession, there is simply no basis for

concluding that any state actor has deprived a criminal defendant of due process of law."). Yellowhorse's central argument is that the agents exploited Yellowhorse's injuries, distress, and intoxication to coerce statements out of her.   Motion at 8.   Her argument fails because she points to no coercive action by the officers causing the statements.   Connelly, 479 US. At 165 (requiring a causal connection).   Questioning someone who is distressed, hurt, and/or intoxicated is not coercive.

Taking first Yellowhorse's distress, questioning a subject and knowledge of a subject's distressed state of mind is simply not enough to find coercive police action.   See United States v. Guerro, 983 F.2d 1001, 1002-04 (10th Cir. 1993).   Yellowhorse relies on Guerro for her argument, Motion at 8, but the case actually supports the United States' position.   In Guerro, the Tenth Circuit considered whether the district court properly excluded a statement as involuntary where an officer questioned a "very upset" and "crying" subject who had just learned her sister died.   Id. at 1002-03.   The district court found the statement involuntary, noting, among other things the subject's clear distress, her age, her reading skills, and knowledge of English.   Id. at 1003.   Though suppressing the statement, the district court noted explicitly that "there was not much evidence of intimidation by Officer Hanson," but concluded such evidence was not necessary to find the statement involuntary as the "circumstances under which the interview was conducted were extremely intimidating."   Id.

The Tenth Circuit reversed.   Id. at 1004.   In reversing, it noted that, in order "to find a statement involuntary, the police must somehow overreach by exploiting a weakness or condition known to exist."   Id.   In Guerro, no such overreach existed – "firm, directive actions" in questioning the distraught subject was not enough to make out "coercive activity" causing a "confession by defendant."   Id.   As in Guerro, so too here.   Agent Loos's questioning of

10

Yellowhorse, even though she was distraught is not enough to make his actions coercive or her statements involuntary.

Similar caselaw shows that agents do not act with the requisite coercion even if they know a defendant is distressed, hurt, and potentially cognitively compromised. In a case with even more severe facts of distress, injury, and potential intoxication, the Tenth Circuit affirmed a district court's conclusion that statements made were voluntary. See United States v. Short, 947 F.2d 1445 (10th Cir. 1991). In Short, the subject was taking doctor-prescribed Percodan and Hydracodeine every four hours for injuries suffered in a motorcycle accident. Id. at 1447. These injuries were apparent on his person: he had two arms in casts, a broken nose, and a bandage on his face covering up 100 stitches. Id. at 1447. Officers interviewing the subject noted that he appeared to be in pain, but also that he was coherent and understood what was occurring. Id. at 1448. There was conflicting evidence about whether the subject took pain pills during the interview, but there was testimony that the pain medication made him forget where he was and allowed him to sleep. Id. at 1447-48. Finally, during questioning, the officers handcuffed the subject's 11-year old daughter in his presence, causing the subject "to complain[] numerous times" and clear distress. Id. at 1448, 1450.

Even with those facts, the Tenth Circuit concluded the agents were not coercive and the subject's statements were voluntary. Id. at 1450. In so concluding, it found, among other things that "[d]espite the pain and the drugs" the subject "conversed intelligently with his questioners," even trying to negotiate for "advantages" with them. Id. The subject also warned officers about a dangerous item in his home and how to carefully handle it. Id. Those facts showed the subject's "pain was not so great, nor was his mind so clouded by pain pills that he was unable to think and

converse with the police freely and intelligently on several subjects." Id.  In short, his statements were voluntary.  Id.

Here, while there is evidence that Yellowhorse was in pain and distress, as the subject in Short, and had been drinking, that evidence is not enough to deem the agent's actions coercive. Yellowhorse responded coherently to questioning, she could walk and talk with the agent, and there is evidence her statement to Agent Loos here was calculated, as it is flatly inconsistent with what she later admitted to agents in a separate interview, not challenged here.  Ex. 3 at 1-4 (admitting that they did not drop the victim off at "Don Diego's" and describing how she saw Chischilly nail the victim to the floor).  On these facts, a voluntary finding would be consistent not just with the cases already cited, but with the great weight of authority.  See e.g., United States v. Minjares-Alvarez, 264 F.3d 980, 982-83, 985 (10th Cir. 2001) (statements voluntary even though agents smelled alcohol on subject and saw empty beer cans and a partially consumed one near subject, because subject "was lucid" could physically move around and "showed no signs of intoxication"); Cardenas v. Hartley, 448 F. App'x 826, 828 (10th Cir. 2011) ("[M]erely because Mr. Cardenas was intoxicated and distraught does not undermine the voluntariness determination.") (citations omitted); United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010) ("[T]he state of intoxication does not automatically render a statement involuntary."); United States v. DeLeon, 326 F. Supp. 1257, 1294 (D.N.M. 2018) (concluding statement voluntary even though evidence defendant had taken Xanax and Oxycodone the day before the interview, because the subject "respond[ed] quickly and responsively to questions").

The only action Yellowhorse points to beyond Agent Loos' questioning to support coercive action and suppression is that he delayed EMS from evaluating Yellowhorse's condition.  Motion at 8.  But that action cannot be deemed coercive when Yellowhorse indicated several times that

she did not want medical care.  Doc. 77-3 at 9, 20; Ex. 2 at 6:02 – 6:13, 14:48-14:44.  Put succinctly, it was not coercive for agents to delay something that Yellowhorse did not want.  Other facts also indicate there was no coercive pressure with respect to medical care.  Indeed, when EMS arrived and Agent Loos asked for some extra time with Yellowhorse, she did not object.  Had she objected, there is every indication the agents would have accommodated her, as they had accommodated her other requests, such as going for a walk and getting her someplace warmer.  Doc. 77-3 at 19-20, 53; Ex 2 at 13:25 – 14:37

Finally, even if the Court concluded there was some coercive action, the relevant factors do not demonstrate she was unusually susceptible to coercion.  See supra Lopez, 437 F.3d at 1063–64 (requiring coercive action before determining whether individual factors demonstrate susceptibility to coercion).  Yellowhorse was 48 when interviewed.  Her level of schooling is unknown, but she discussed her situation intelligently with the agents.  She was not detained at the time, but the length of questioning was just over an hour.  As noted above, questioning occurred outside in broad daylight and questioning was conducted in a conversational tone.  She was not advised of her constitutional rights, but that issue is not dispositive.  She was not threatened or subject to physical punishment in any way.  Yellowhorse's statement was voluntary.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny the relief requested in the Motion.

Respectfully submitted,

FRED J. FEDERICI
Acting United States Attorney


*/s/ electronically filed September 27, 2021*
FREDERICK MENDENHALL
JENNIFER ROZZONI
Assistant U.S. Attorneys
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 224-1402 phone
(505) 346-7296 fax

I hereby certify that a copy of this
motion was delivered via CM/ECF
to counsel for the defendant.

*Electronically filed*
FREDERICK MENDENHALL

14